UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Jessica Fountain

    v.                                      Civil No. 14-cv-121-LM
                                                  Opinion No. 2016 DNH 020

First Data Merchant Services

**O R D E R**

Jessica Fountain has sued her former employer, First Data Merchant Services ("First Data"), asserting a claim under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654.[1] Before the court is First Data's motion for summary judgment. Fountain objects.

**Standard of Review**

A movant is entitled to summary judgment where he "shows that there is no genuine dispute as to any material fact and [that he] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing the record, the court construes all facts and reasonable inferences in the light most favorable to the nonmovant. Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 115 (1st Cir. 2013).

---

[1] The court previously granted First Data's motion to dismiss two claims asserted under the Americans With Disabilities Act, 42 U.S.C. §§ 12101-12213.

**Background**

The facts are summarized from First Data's undisputed statement of material facts ("SMF") offered in support of its motion for summary judgment (doc. no. 31-1 at 2-9). These facts are not in dispute unless noted.

Fountain was hired by First Data's predecessor, EFS Card Services ("EFS"), in 1998 as an account executive. For each account executive, First Data issues an annual Regional Account Executive Sales Compensation Plan ("Compensation Plan"), which sets forth the terms of compensation and performance goals of the account executive. At all times relevant to this matter, Fountain worked remotely, with a company laptop and phone.

From at least 2004, when First Data acquired EFS, through 2011, Fountain was a "strong performer, and exceeded 100% of her Compensation Plan performance standards." SMF ¶ 7. In 2010, Fountain produced some of the strongest sales numbers in the company.

While she was a strong performer, First Data twice granted Fountain intermittent leave under the FMLA. Fountain first took FMLA leave in September 2009, when she experienced personal health issues, and she took her second FMLA leave in April 2011, to care for her son. Fountain's second leave ended in October 2011.

In late 2011, Regional Sales Director Jared Kirkpatrick became Fountain's direct supervisor. A few months later, in February 2012, First Data granted Fountain a third intermittent FMLA leave, again to care for her son. During her third FMLA leave, Fountain took time off in February, March, June, and July 2012. Fountain's third leave ended in August 2012.

Beginning in January 2012, Fountain's performance began to fall off. Fountain did not meet 80% of her revenue goal in January, and she continued to struggle generating revenue thereafter.

In May 2012, in an effort to assist Fountain in improving her revenue, Kirkpatrick proposed weekly one-on-one calls and visited Fountain. Throughout the middle of 2012, however, Fountain's revenue numbers continued to languish below 80% of her revenue goal. It appears, however, that Kirkpatrick had failed at this time to adjust Fountain's revenue goals to account for her FMLA leave.[2]

On October 10, 2012, Kirkpatrick issued Fountain a 90-day Improvement Action Plan ("IAP"). An IAP is First Data's final disciplinary step before discharging an employee. It provides

---

[2] Fountain agrees, however, that she did not meet 80% of her revenue goal for any month in 2012, including after Kirkpatrick later adjusted her revenue goals to account for her FMLA leave.

an action plan for the employee, including specific goals and expectations aimed at assisting improvement.

Fountain failed to comply with some of the expectations set forth in the IAP, and her sales numbers declined after receiving the IAP, falling below 50% of her revenue goal for October, November, and December. On January 9, 2013, the day before Fountain's 90-day IAP period was to conclude, Kirkpatrick sent an email to his supervisors and First Data's Human Resources Department regarding Fountain's performance. The email, which summarized a phone call Kirkpatrick had with Fountain earlier that day and his intentions thereafter, stated:

> The bottom line of our conversation is that she isn't working and needs to get out and start finding new business and opportunity for herself . . . . [B]arring an exceptional turnaround, I still plan on terminating her this Friday [January 11]. I am very concerned that she is no longer willing to put in the kind of work required to be successful and that even a short term turnaround this late in the game will not last.

SMF ¶ 13.

In response to the January 9, 2013 phone call with Kirkpatrick, Fountain put herself in "out of office" status. Kirkpatrick emailed Fountain on January 11, asking her to call him. Kirkpatrick intended to discharge Fountain when he spoke to her.

Rather than calling Kirkpatrick, Fountain emailed First Data's Human Resources Manager Gayla Baker. In that email,

4

Fountain claimed, for the first time, that she was afraid of Kirkpatrick and that Kirkpatrick had threatened her.

On January 15, 2013, Baker emailed Fountain requesting additional information to investigate her complaint against Kirkpatrick. Baker requested that Fountain provide her with any additional information by January 17. In that email, Baker informed Fountain that the purpose of Kirkpatrick's attempt to contact her on January 11 was to notify Fountain that she had been placed in "termination status," but that the termination status was on hold pending the investigation into Fountain's claim against Kirkpatrick.

Fountain responded by asking to move the deadline to January 18 to provide more information. She also requested FMLA paperwork because she was having surgery on January 16. Baker responded that she would ask the Human Resources Service Center to send Fountain the FMLA form, but also told Fountain that her employment was still in termination status, on hold pending review of her complaint about Kirkpatrick. After receiving the paperwork, Fountain applied for FMLA leave.[3]

---

[3] As discussed further below, despite initially failing to adjust Fountain's revenue goals to account for her FMLA leave, Kirkpatrick subsequently adjusted Fountain's quotas in late-January 2013, after an inquiry from First Data's Human Resources department.

First Data investigated Fountain's complaint about Kirkpatrick and found no wrongdoing.[4]  After the investigation closed but before First Data could process the termination, an attorney representing Fountain contacted First Data.  First Data kept Fountain's termination status on hold during discussions between counsel for First Data and Fountain.  First Data eventually discharged Fountain, effective February 11, 2013.

First Data asserts that it had not taken any action on Fountain's 2013 FMLA leave request as of the date she was terminated.  An internal First Data record produced in discovery, however, shows that First Data granted Fountain's 2013 FMLA leave request.

## Discussion

In its order granting, in part, First Data's motion to dismiss, the court characterized Fountain's remaining claim, a retaliation claim under the FMLA, as follows:

> Construed in the light most favorable to Fountain, and in light of the allegations in her failed attempt to state a [29 U.S.C.] § 2615(a)(1) claim, Fountain's § 2615(a)(2) claim is that First Data discharged her

---

[4] Fountain asserts that Baker did not conduct a legitimate investigation into her complaint.  In support, she argues that Baker did not make any record of their conversation or of the investigation itself, and that Baker based her conclusion almost entirely on Kirkpatrick's word.

6

>    in retaliation for both taking FMLA leave, and for
>    requesting another such leave in January of 2013.

Order (doc. no. 22) at 20.

The FMLA forbids an employer from retaliating against an employee for exercising her FMLA rights. Henry v. United Bank, 686 F.3d 50, 55 (1st Cir. 2012) (citing 29 U.S.C. § 2615(a)). "Thus, for example, an employer may not use an employee's FMLA leave as a negative factor in deciding to hire, fire, promote, or provide benefits to an employee." Carrero-Ojeda v. Autoridad de Energía Eléctrica, 755 F.3d 711, 719 (1st Cir. 2014).

Where direct evidence of retaliation does not exist, courts apply the three-step framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), which is used in Title VII and other civil rights cases. Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 335-36 (1st Cir. 2005). The parties agree that Fountain lacks direct evidence of retaliation.

Under the McDonnell Douglas framework, the employee carries the initial burden to establish a prima facie case of retaliation. Id. at 336. "If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the termination." Ameen v. Amphenol Printed Circuits, Inc., 777 F.3d 63, 69 (1st Cir. 2015) (internal quotation marks and citation omitted). "If

7

the employer can proffer evidence sufficient to raise a genuine issue of fact as to whether it discriminated against the employee . . . the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for terminating [her] was in fact a pretext for retaliating against [her] for having taken protected FMLA leave." Id. (internal quotation marks and citations omitted).

First Data argues that Fountain cannot make out a prima facie case of retaliation, but that even if she could, First Data can articulate legitimate, nondiscriminatory reasons for the termination.  First Data further argues that Fountain cannot show that its reasons for terminating her were pretext for retaliation.

Fountain contends that she establishes a prima facie case of retaliation.  While she does not dispute that First Data can articulate legitimate, nondiscriminatory reasons for her termination – that Fountain failed to meet the performance criteria set forth in the 2012 Compensation Plan, and failed to meet the IAP requirements - she argues that there is a genuine issue of material fact as to whether First Data's reasons for terminating her were pretext for retaliation.

A.   Prima Facie Case

To make a prima facie showing of retaliation, a plaintiff must show that "(1) she availed herself of a protected FMLA right; (2) she was adversely affected by an employment decision; and (3) there was a causal connection between [her] protected conduct and the adverse employment action." Carrero-Ojeda, 755 F.3d at 719 (internal quotation marks and citation omitted). "The prima facie burden is 'quite easy to meet,' and all inferences must be taken in the light most favorable to . . . the party opposing summary judgment." Pierce v. Alice Peck Day Mem'l Hosp., No. Civ. 00-318-M, 2002 WL 467125, at *6 (D.N.H. Mar. 11, 2002) (quoting Villanueva v. Wellesley Coll., 930 F.2d 124, 127 (1st Cir. 1991)).

In moving for summary judgment, First Data does not contest that (1) Fountain, in taking FMLA leave in 2009, 2011, and 2012, and requesting to take FMLA leave in 2013, availed herself of her protected rights, and (2) Fountain was adversely affected by First Data's decision to terminate her.  First Data argues only that Fountain lacks any evidence of a causal connection between her protected conduct and her termination.

To establish a causal connection, a "plaintiff must show that the adverse employment actions were taken against her because she attempted to exercise a right protected by the FMLA."  Crevier v. Town of Spencer, 600 F. Supp. 2d 242, 261 (D.

9

Mass. 2008) (emphasis omitted).  "A causal connection can be established . . . through . . . factors including the sequence of events leading to the adverse action, departures from normal procedure, and any contemporaneous statements made by decisionmakers."  Richard v. U.S. Postal Serv., 219 F. Supp. 2d 172, 182 (D.N.H. 2002) (citing Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 168 (1st Cir. 1998)).  In addition, "'[v]ery close' temporal proximity between protected activity and an adverse employment action can satisfy a plaintiff's burden of showing causal connection."  Sanchez-Rodriguez v. A T & T Mobility P.R., Inc., 673 F.3d 1, 15 (1st Cir. 2012) (quoting Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004)).

Viewing the evidence in the light most favorable to Fountain, the timing between Fountain's FMLA leave request in January 2013 and the date of her termination, February 11, 2013, is sufficient to demonstrate the necessary causal link for purposes of a prima facie case.  Given the "low threshold required to meet the [causation] prong of [a] prima facie case," Hodgens, 144 F.3d at 169, the fact that First Data terminated Fountain less than a month after she requested FMLA leave is enough to satisfy the causal connection prong of Fountain's prima facie case.  See Wagner v. Baystate Health, Inc., No. 12-cv-30146-MAP, 2013 WL 5873295, at *4 (D. Mass. Oct. 29, 2013)

("Both a one-month and two-month interval between a protected activity and adverse action have been classified as 'close enough' to imply retaliation for purposes of the prima facie case." (citing Mariani-Colon v. Dep't Homeland Sec. ex. rel. Chertoff, 511 F.3d 216, 224 (1st Cir. 2007))).

First Data argues that the court cannot take into account Fountain's January 2013 FMLA leave request because the decision to terminate Fountain was made on January 11, 2013, prior to Fountain's request. Evidence in the record shows, however, that Baker put Fountain's termination status on hold during her investigation into Fountain's complaint about Kirkpatrick. In addition, in late-January 2013, Kirkpatrick, Baker, and other First Data employees sent emails discussing Fountain's quota achievement numbers, particularly in light of her FMLA leave,[5] as well as emails regarding how many hours Fountain was authorized to miss under her 2012 FMLA leave. See Ex. D to Obj. (doc no. 32-6) at 1, 7, 8; see also Ex. 10 to Mot. (doc. no. 31-12). Thus, evidence in the record shows that while Fountain's termination status was on hold, Fountain's supervisor and First

---

[5] In one email, Kirkpatrick provides Baker with Fountain's "sales volume and YTD revenue percentage for the Oct – Dec time frame." Ex. D to Obj. (doc no. 32-6) at 8. Kirkpatrick concedes in a later email in the chain that the numbers he provided are not adjusted to account for Fountain's FMLA leave. Id. at 7. He subsequently emails Baker with Fountain's adjusted numbers. See Ex. 7 to Mot. (doc. no. 31-9).

Data's Human Resources department were discussing Fountain's performance and absences, supporting the inference that no final termination decision had been made.[6]  See Louis v. Bear Hill Nursing Ctr., No. 11-11540-GAO, 2014 WL 4966037, at *5-6 (D. Mass. Sept. 30, 2014) (construing dispute over termination date in an FMLA retaliation case in plaintiff's favor); Sampson v. Arbour-Fuller Hosp., No. 11-10487-RWZ, 2012 WL 5386099, at *9 (D. Mass. Nov. 2, 2012) (same); Zungoli v. United Parcel Serv., Inc., No. 07-2194, 2009 WL 1085440, at *6 (D.N.J. Apr. 22, 2009) (same).

Therefore, in light of the close timing between Fountain's January 2013 FMLA leave request and her termination, under the plaintiff-friendly summary judgment standard, Fountain has sufficiently shown the causal connection necessary to move forward.[7]

B.   Pretext

First Data has articulated legitimate, nondiscriminatory reasons for Fountain's termination – her substandard performance

---

[6] First Data states in its reply that these emails were sent to gather information to respond to questions received from Fountain's attorney.  The record, however, is unclear as to the purpose of those emails.

[7] In addition, the record evidence that First Data granted Fountain's 2013 FMLA leave request supports an inference that it had not reached a final decision as to Fountain's termination as of January 11, 2013.

in 2012 and her failure to meet the IAP requirements.  The burden thus shifts to Fountain to show that First Data's stated reasons for terminating her were pretextual and were instead retaliation for taking or requesting FMLA leave in January 2013.

A "nonmoving plaintiff may demonstrate pretext either indirectly by showing that the employer's stated reasons for its adverse action were not credible, or directly by showing that that action was more likely motivated by a discriminatory reason."  Hodgens, 144 F.3d at 168.  When the issue is whether the employer's reasons are pretextual, "courts must be 'particularly cautious' about granting the employer's motion for summary judgment."  Id. at 167 (quoting Stepanischen v. Merchs. Despatch Transp. Corp., 722 F.2d 922, 928 (1st Cir. 1983)).

Fountain asserts that the evidence demonstrates pretext because Kirkpatrick either did not initially adjust Fountain's sales quotas in 2012 to account for her FMLA leave or, if he did, he never informed Fountain of the correct quotas.[8]  Fountain also points to the fact that she requested, and may have been

---

[8] Fountain asserts that Kirkpatrick first adjusted the quotas in the above-referenced late-January 2013 email, only after Baker asked him whether the quotas he provided had taken Fountain's FMLA leave into account.  There is evidence in the record that Kirkpatrick may have adjusted Fountain's quota achievement to account for her FMLA leave in October 2012, when he issued the IAP.  See Ex. 9 to Mot. (doc. no. 31-11).  The record shows, however, that regardless of whether Kirkpatrick adjusted the numbers when he created the IAP, he was still using the unadjusted quota achievements in January 2013.

granted, FMLA leave shortly before her termination. Further, Fountain asserts that First Data's investigation into her complaint against Kirkpatrick "was a sham." Pl.'s Obj. (doc. no. 32-1) at 8.

Here, although Fountain's evidence is not overwhelming, viewed generously, she can demonstrate "at least to the level of trialworthiness," Hodgens, 144 F.3d at 166, that First Data's stated reasons for termination were a mere pretext. For example, viewing the evidence in the light most favorable to Fountain, a reasonable jury could infer that the reason Kirkpatrick improperly failed to adjust Fountain's revenue goal to account for her FMLA leave was because he was dismayed by Fountain taking another leave, particularly after a month in which she performed poorly. See, e.g., Lukacinsky v. Panasonic Serv. Co., No. 03-40141-FDS, 2004 WL 2915347, at *16 (D. Mass. Nov. 29, 2004) (holding that a genuine issue of material fact existed as to pretext when the employee's supervisor improperly took into account the employee's FMLA absences from work when evaluating his performance).

In addition, Fountain testified in her deposition that Kirkpatrick failed to adequately support her throughout 2012, for example, by not assisting her in generating new business or otherwise increasing her sales numbers. Taken in the light most favorable to Fountain, her testimony could support a theory that

14

Kirkpatrick failed to do so because of dismay at Fountain's FMLA leave.[9]  The record, viewed favorably to Fountain, also shows that after receiving Fountain's fourth FMLA request in January 2013, Baker may not have conducted a thorough investigation into Fountain's complaint about Kirkpatrick.  Baker's failure to conduct a thorough investigation could support the inference that First Data wanted to terminate Fountain because of her FMLA leave.

Although Fountain has certain evidentiary hurdles to overcome at trial, at this stage of the litigation, Fountain receives the benefit of every favorable inference.  Construed favorably to her, the record shows the existence of genuine issues of material fact as to whether First Data terminated her in retaliation for her having exercised her rights under the FMLA.  See McAleer v. Starbucks Corp., No. 12-11631-RGS, 2014 WL 346004, at *3 (D. Mass. Jan. 31, 2014) ("It is open to a jury to find that Lane was irritated by McAleer's leave requests, resented having to fill in for him during his absences, and imposed a PIP with conditions that were designed to ensure

---

[9] First Data notes that Fountain's complaint alleges that Kirkpatrick failed to give her adequate support even before she requested FMLA leave in 2012.  In light of the summary judgment standard, that allegation does not negate the potential inference that Kirkpatrick's continued failure to support Fountain was due to her having exercised her rights under the FMLA.

McAleer's failure, in retaliation for his exercise of his FMLA rights."); Surprise v. Innovation Grp., Inc./First Notice Sys., Inc., 925 F. Supp. 2d 134, 144 (D. Mass. 2013) ("It is certainly true that the evidence of discrimination is slight; indeed, the claim hangs by the slenderest of threads.  It is also true that there is an inherent danger that a bad employee will begin to make complaints of discrimination in order to intimidate the employer and prevent his or her termination.  Nonetheless, in the circumstances here, a reasonable juror could conclude that the proffered reason for plaintiff's termination was pretextual."); Lukacinsky, 2004 WL 2915347, at *16.

Accordingly, First Data is not entitled to summary judgment.

### Conclusion

For the foregoing reasons, defendant's motion for summary judgment (doc. no. 31) is denied.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

January 27, 2016

cc:   Darlene M. Daniele, Esq.
      K. Joshua Scott, Esq.
      Kenneth M. Wentz, III, Esq.